UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:20-cv-01322-SB-MRW<br>2:21-cv-05013-SB-MRW | Date: | 12/10/2021 |
|---|---|---|---|

| Title: | *Pinkerton Tobacco Co., LP et al v. The Art Factory AB, et al.*<br>*Modoral Brands Inc. v. Swedish Match North America LLC, et al.* |
|---|---|

| Present: The Honorable | **STANLEY BLUMENFELD, JR., U.S. District Judge** |
|---|---|

| Victor Cruz | Miriam Baird |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| Erik Raymond Puknys | Brian J. Pew |
| Bryan C. Diner | Colin W. Fraser |
| Caitlin E. O'Connell | David Spencer Bloch |
| Timothy J. May | Vivian S. Kuo |
| Donald L. Ridge | |

**Proceedings: MARKMAN ORDER (PINKERTON DKT. NOS. 215, 218, 222, 223; MODORAL DKT. NOS. 125, 134)**

This Markman Order construes disputed claim limitations in two cases consolidated for pretrial purposes. In the first case, Plaintiffs Pinkerton Tobacco Co., LP, Swedish Match North America LLC, NYZ AB, and wm17 Holding GMBH (collectively, Pinkerton) allege that Defendants Kretek International, Inc. and Dryft Sciences, LLC's (collectively, Kretek) DRYFT-brand nicotine pouch infringes their patent. *See* Case No. 20-1322 (*hereinafter* "Pinkerton") Dkt. No. 1 (Complaint). In the second case, Plaintiff Modoral Brands Inc. seeks a declaration of patent invalidity, patent non-infringement, and no trade secret misappropriation as related to claims asserted by Defendants Swedish Match North America LLC,

Pinkerton Tobacco Co. LP, NYZ AB, and Helix Innovations GMBH. *See* Case No. 21-5013 (*hereinafter*, "Modoral") Dkt. No. 120 (First Amended Complaint).

Before the Court are the parties' Markman briefs in which they present one agreed and three disputed claim limitations for construction. *See* Pinkerton Dkt. Nos. 215 (Kretek's Opening Claim Construction Brief (KOB)), 218 (Pinkerton's Opening Claim Construction Brief (POB)), 222 (Kretek's Responsive Claim Construction Brief (KRB)), 223 (Pinkerton's Responsive Claim Construction Brief (PRB)); *see also* Modoral Dkt. Nos. 125 (Modoral's Supplemental Claim Construction Brief (MSB)), 134 (Swedish Match's Supplemental Claim Construction Brief (SSB)).

The parties also filed demonstratives for use at the Markman hearing. *See* Plaintiffs' Notice of Lodging (Pinkerton Dkt. No. 237); Defendants' Notice of Lodging and Demonstratives (Pinkerton Dkt. Nos. 236, 238). Pinkerton filed an Objection to Defendants' Demonstrative Evidence (Dkt. No. 241). The Court has considered the Objection and denies it as moot. Demonstratives are not evidence. To the extent that Defendants present new arguments or citations to new authority for the first time in their demonstratives, however, the Court declines to consider that information, as it should have been included in the extensive Markman briefing.

Thus, following the claim construction hearing, which the Court held on December 10, 2021, the Court construes the agreed and disputed terms as stated herein.

## I.

## Technological Background

In the Pinkerton action, Plaintiffs assert U.S. Patent No. 9,161,908 (the '908 Patent) against Defendants. In the Modoral action, Plaintiff seeks declaratory judgment of invalidity and non-infringement of the '908 Patent. The '908 Patent, entitled "pouch containing nicotine in free salt form," issued on October 20, 2015. "The invention relates to a product for oral delivery of nicotine containing a core comprising a powder of at least one free nicotine salt, at least one pH adjusting agent and at least one filler, and a water insoluble pouch," whereby saliva enters the pouch and begins to dissolve the powder, producing a pH of at least 6. *See* '908 Patent at Abstract; *see also id.* at 3:49-60 (describing interaction of nicotine salt and pH adjusting agent and transfer of nicotine from oral pouch into the mucosal

membrane). The patent recognized that nicotine "provides satisfaction," but consuming nicotine via smoking creates "health hazards." *Id.* at 1:26-28. Therefore, the patent sought to "formulate alternative means of administering nicotine in a pleasurable manner to facilitate reduction of or cessation from smoking." *Id.* 1:34-36.

Although the prior art offered nicotine delivery through means other than smoking—including via an oral pouch—the patent disclosed a new oral pouch featuring "rapid delivery" of nicotine for "rapid satisfaction," with "an almost complete delivery of the nicotine to the user to avoid unnecessary waste," all while avoiding the "volatility" of using nicotine base. *See id.* at 1:39-57.[1] As to volatility, "[a] number of different formulations where the nicotine base has formed a combination with other components ha[d] been developed [in the prior art] to deal with the stability and volatility problems of nicotine base. Nicotine base has for example been bound to, adsorbed to, absorbed into, enclosed into or forming a complex or any other non-covalent bounding [*sic*] with other components, such as starch, alginate salts, beta-cyclodextrin and cellulose." *Id.* at 1:57-64.

Some disadvantages of prior art nicotine delivery systems included the fact that they did not focus on a "rapid nicotine release rate" and they required "rather intricate manufacturing method[s]." *Id.* at 2:25-26, 29. To overcome these problems, the patent sought to provide "a nicotine formulation with a satisfactory chemical stability . . . without compromising . . . rapid nicotine delivery and a simple manufacturing method." *Id.* at 2:30-33; *see also id.* at 2:56-59 ("The product should give a rapid and almost complete delivery of nicotine, be free from other harmful components, deal with the stability and volatility problems of nicotine base and finally be cheap and simple to manufacture.").

In considering issues of stability and absorption, the patent observes that, nicotine salts "are not readily absorbed through mucosal membranes." *Id.* at 2:4-10. To address this obstacle, the patent states that the low absorption rate of nicotine salts can be overcome "by incorporating a pH adjusting agent which converts the nicotine salt into nicotine base in situ [on site]." *Id.* at 3:10-16.

---

[1] "Nicotine is generally in either base form or in salt form. Nicotine base is readily absorbed through the mucosal membranes. Unfortunately, nicotine base is highly unstable and is difficult to contain using conventional packaging materials. Nictone salts, on the other hand, are generally stable." *Id.* at 2:4-10.

Specifically, the patent states that using a "free" nicotine salt ("i.e., it only needs to be mixed together with the other components in the powder") that is "reasonably water soluble" for "rapid dissolution of nicotine." *Id.* at 3:23-27. The patent notes that a person skilled in the art could "easily" select a "suitable nicotine salt" based on these properties. *Id.* at 3:28-30.[2]

To that end, Claim 1, which is illustrative, discloses:

> A product for oral delivery of nicotine containing a core comprising a powder of
>
> a) at least one free nicotine salt
>
> b) at least one pH adjusting agent
>
> c) at least one filler
>
> and a water insoluble pouch, wherein said pouch is permeable for saliva and therein dissolved parts of the powder, wherein said product upon contact with purified water gives a pH of at least 6 and wherein said powder being substantially free from adsorbed and/or absorbed nicotine.

'908 Patent at Claim 1.

By creating a nicotine pouch according to the disclosed invention, the patent asserts that, "[i]t is for the first time possible to obtain a product comprising a powder mixture with a free nicotine salt that gives a rapid and almost complete delivery of nicotine which becomes available for the consumer, is free from other harmful components, deals with the stability and volatility problems, and finally is cheap and simple to manufacture. With the [disclosed] product the consumer will get a faster satisfaction compared to several other products available on the market today, such as nicotine gums." *Id.* at 4:7-16.

II.

[2] More particularly, in the Definitions section, the specification provides that, "The term 'free' nicotine salt is intended to mean that the nicotine salt in the product during storage, before use by the consumer, does not form any combination with any other component in the product. By providing the nicotine as a suitable salt, the nicotine source is not volatile or prone of [*sic*] oxidation and thereby stable during storage, eliminating the need for a combination." *Id.* at 4:38-44.

Legal Standard

Claim construction is an interpretive issue "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). It is "a question of law in the way that we treat document construction as a question of law," with subsidiary fact-finding reviewed for clear error pursuant to Fed. R. Civ. P. 52(a)(6). *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325–29 (2015). The claim language itself is the best guide to the meaning of a claim term. *See Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014). This is because the claims define the scope of the claimed invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). But a "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." *Id.* at 1313. Thus, claims "must be read in view of the specification," which is "always highly relevant to the claim construction analysis." *Id.* at 1315 (internal quotations omitted).

Although claims are read in light of the specification, limitations from the specification must not be imported into the claims. *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009). "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323.

The prosecution history may lack the clarity of the specification, but it is "another established source of intrinsic evidence." *Vederi*, 744 F.3d at 1382. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citations omitted). "Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent." *Id.* "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Claim construction usually involves resolving disputes about the "ordinary and customary meaning" that the words of the claim would have had "to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312–13 (internal quotations and citations omitted). But in some cases, claim terms will not be given their ordinary meaning because the specification defines the term to mean

something else. "[A] claim term may be clearly redefined without an explicit statement of redefinition," so long as a person of skill in the art can ascertain the definition by reading the patent documents. *Id.* at 1320; *see also Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016).

Where the patent itself does not make clear the meaning of a claim term, courts may look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including the prosecution history and "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (internal quotations omitted). Sometimes, the use of "technical words or phrases not commonly understood" may give rise to a factual dispute, the determination of which will precede the ultimate legal question of the significance of the facts to the construction "in the context of the specific patent claim under review." *Teva*, 574 U.S. at 332. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.*

## III.

## Terms for Construction

### A.
### Agreed Terms

The parties have agreed on the construction of the following term and the Court adopts that agreed construction. *See* Pinkerton Dkt. No. 204 at 2.

| **Claim Term** | **Parties' Agreed Construction** |
|---|---|
| "granulated"<br>(Claim 21) | Plain and ordinary meaning, which a person of ordinary skill in the art would understand means "formed into grains or agglomerates" |

B.
Disputed Terms

1. "Free nicotine salt" (Claim 1)

| **Pinkerton/Swedish Match's Proposed Construction** | **Kretek's Proposed Construction** |
|---|---|
| "a nicotine compound formed from the ionic bonding of a nicotine base cation with an acidic anion, which compound does not combine with the other components in the pouch" | "a stable form of nicotine that is not in the form of a base or a combination, including complexes (e.g., an ion-exchange resin complex) that, during storage, before use by the consumer, does not form any combination with any other component in the product" |
| **Modoral's Proposed Construction** | **Court's Construction** |
| "a chemical compound composed of related numbers of nicotine cations (positively charged ions) and anions (negatively charged ions), whereby nicotine base is not bound to, adsorbed to, absorbed to, absorbed into, enclosed into or part of a complex (e.g., an ion-exchange resin complex), and that during storage, before use by the consumer, nicotine does not form any combination with any other component in the product" | "a nicotine compound formed from the ionic bonding of a nicotine base cation with an acidic anion, which does not include nicotine complexes and does not form any combination with any other component in the product while in storage" |

The parties agree that "free," as defined in the specification, means that the nicotine salt "does not form any combination with any other component in the product" while in storage. *See* '908 Patent at 4:38-44. The Court adopts that construction. Turning to "nicotine salt," the parties disagree whether it should be construed broadly to include "complexes" or more narrowly to exclude complexes.

From Pinkerton's perspective, "a nicotine salt forms when nicotine base is protonated with a hydrogen atom that is donated by an acid, which transforms nicotine base into a positively-charged cation through covalent bonding. The now

positively charged nicotine cation then ionically bonds with the now negatively-charged anion to form a salt." POB at 13 (citing Ridge Decl., Ex. 4 (Davies Decl.) at ¶ 17 (Dkt. No. 218-5)). Pinkerton explains that, through this process, either "a *simple* salt like nicotine bitartrate or a *complex* salt like nicotine polacrilex" can be formed. *Id.* at 13-14 (emphasis added); *see also id.* at 16-17 (arguing nicotine polacrilex fits the patent's definition of a "nicotine salt" because it "is formed from a chemical reaction in which a positively charged nicotine base is transformed through covalent bonding to form a positively charged cation," which "ionically bond[s] with the now negatively charged methacrylic acid anions on the polacrilex compound to form a nicotine salt"). Thus, Pinkerton concludes that a person of ordinary skill in the art (POSA) would understand "free nicotine salt" to mean ""a nicotine compound formed from the ionic bonding of a nicotine base cation with an acidic anion, which compound does not combine with the other components in the pouch." *Id.* at 14 (citing Ridge Decl., Ex. 2 (Williams Decl.) at ¶ 28 (Dkt. No. 218-3).

Pinkerton rejects the notion that the inventor acted as his own lexicographer to give "nicotine salt" a narrow meaning, or to clearly disclaim all nicotine complexes from the definition of "nicotine salt." Pinkerton argues this is evident because the specification defined "free," but opted not to define "nicotine salt," demonstrating that the inventor wanted to apply the plain and ordinary meaning of that term. *Id.* at 14-15. Pinkerton contends that Example 10 in the specification does not change this fact because the illustration "describes *reference products* that are unsuitable for the oral delivery of nicotine[,] because they have a nicotine release rate far lower than the release rates of the products of the invention," and that "nothing in the specification suggests that *all products* containing nicotine polacrilex are unsuitable." *Id.* at 17 (emphasis added). Pinkerton also argues that the reference products in Example 10 were unsuitable for use in the claimed invention because of "the low ratio of pH adjusting agent to nicotine base," which "led to the low release rates of reference products 10R1 and 10R2," and "not the nicotine source." *Id.* In any event, Pinkerton argues that "the[] statements in Example 10 [are] entirely inconsistent with the passage in column 1 [referring to combinations and complexes], the rest of the specification, and contrary to fundamental scientific principles," and therefore are unreliable. *Id.* at 24-25.

Further, Pinkerton argues that the specification excludes only non-covalently bound "combinations," not covalently or ionically bound nicotine salts such as nicotine polacrilex (i.e., excluding combinations "only interact[ing] with the other component through a weak physical interaction and remain[ing] in its base form," and including interactions involving a chemical reaction). PRB at 5, 7. Thus,

Pinkerton explains that, whether a nicotine "complex" is a "combination" or a "salt" depends on the type of bonding involved. *Id.* at 8. Given the specification's incorrect implication that nicotine polacrilex is a "combination" as defined by the patent, Pinkerton argues that this ambiguity precludes a disclaimer finding. *Id.* at 13.

On the other hand, Kretek observes that "all examples of the reference products in Example 10 contain nicotine microcrystalline cellulose and nicotine polacrilex, both nicotine combinations, and are explicitly described as 'not according to the disclosed invention' because 'the nicotine sources is [] not a nicotine salt as disclosed in the invention.'" KOB at 12 (quoting '908 Patent at 13:14-25). Further, Kretek notes that the prior art references cited in the patent and cited by the Examiner distinguish nicotine salts from nicotine combinations, including nicotine complexes like nicotine polacrilex. *Id.* at 13. Kretek argues that this is consistent with Swedish Match's own patent filings, which "distinguish[] nicotine salts from nicotine complexes. KRB at 2-3 (citing Bloch Dec., Ex. I, ECF No. 215-10 at 12:18-20 ("The nicotine source may be nicotine base, a nicotine salt and/or a nicotine complex such as nicotine bound to an ion exchanger, such as nicotine polacrilex.")).

Kretek rejects Pinkerton's proposed construction because Pinkerton defines "nicotine" and "salt" separately, and then combines those definitions, without the hypothetical POSA "even looking at the patent." KOB at 15. Kretek argues that, when read in light of the patent as a whole, the "specification disparages nicotine combinations in the 'Background Art,' distinguishes nicotine salt from them in the 'Summary of the Invention' and expressly disclaims nicotine polacrilex in the 'Detailed Description of the Invention,''' and therefore, Kretek concludes that "nicotine polacrilex is clearly not within the scope of the claimed invention." *Id.* at 16. Kretek argues that the prosecution history also supports this conclusion. KRB at 4 (citing Bloch Decl., Ex. E, ECF No. 215-6 at 177). Kretek argues that the claimed ambiguity raised by Pinkerton is "caused by the tension [created by] [Plaintiffs'] experts' opinions and the intrinsic record," thereby undermining Pinkerton's proposed construction. *Id.* at 10. Further, Kretek asserts that the type of bonding is irrelevant to whether a form of nicotine is a free nicotine salt. *Id.* at 12.

In its supplemental brief, filed after these matters were consolidated for trial, Modoral advocates for a construction similar to Kretek's proposed construction. Modoral argues that, "the patent specification clearly disclaims complexes" generally, and identifies "nicotine polacrilex complex" specifically, as "falling outside the scope of the invention." MSB at 3-4. Modoral asks, "If the

patent says nicotine polacrilex is not a nicotine salt, how can nicotine polacrilex be a nicotine salt within the meaning of the claims?" *Id.* at 4. In support of the contention that the claimed "nicotine salt" does not comprise complexes like nicotine polacrilex, Modoral provides a number of references "distinguish[ing] nicotine salts from nicotine polacrilex and other ion-exchange complexes." *Id.* at 9-10. Further, even assuming any ambiguity exists, Modoral argues that the Court must turn to the specification to provide clarity. *Id.* at 10. That is, "Example 10 states plainly that the nicotine polacrilex used in the reference examples is 'not a nicotine salt.'" *Id.* at 11 (quoting '908 Patent at 13:43-54).

In its supplemental response brief, Swedish Match rejects Modoral's disclaimer argument, arguing that it "relies on [the] incorrect contention that it is unclear whether nicotine polacrilex was considered a nicotine salt in the prior art." SSB at 6. Swedish Match argues that the statements in Example 10 are inconsistent with the rest of the specification; namely, the reference to nicotine polacrilex as a combination. *Id.* at 5-6 & n.4. Further, Swedish Match contends that the specification differentiates the products in Example 10 based on nicotine release rate, not nicotine source. *Id.* at 7. Thus, Swedish Match concludes that Modoral cannot show clear and unmistakable disclaimer, and Swedish Match's proposed plain and ordinary meaning should apply. *Id.* at 8. Moreover, Swedish Match argues that Modoral's proposed construction ignores the inconsistencies in the specification. *Id.* at 11-13.

At a basic chemistry level, the parties appear to agree that a "nicotine salt" is a chemical compound with related numbers of nicotine cations (positively charged ions) and anions (negatively charged ions). The parties disagree, however, whether the plain and ordinary meaning of nicotine salt includes nicotine "complexes," such as nicotine polacrilex. To answer this question, the Court considers the patent as a whole; claim language is not read in isolation. *Phillips*, 415 F.3d at 1315. A review of the specification demonstrates that it affirmatively limits the scope of nicotine salt to exclude such complexes by distinguishing them from what is claimed and by affirmatively stating they are excluded.

*First*, the specification states that different types of nicotine combinations, including complexes, do not meet certain goals of the claimed invention: rapid release rate and simple manufacturing. That is, to address the volatility of nicotine base, the specification acknowledges prior art formulations of nicotine base in "combination with other components," where nicotine base has, for example, "been bound to, adsorbed to, absorbed into, enclosed into or *forming a complex* or any other non-covalent bounding with other components, such as starch, alginate

salts, beta-cyclodextrin and cellulose." '908 Patent at 1:57-54 (emphasis added). But unlike in the claimed invention, "[a] rapid nicotine release rate has normally not been the major concern for [such] nicotine combinations." *Id.* at 2:25-26. Further unlike in the claimed inventions, such combinations "require[] a rather intricate manufacturing method." *Id.* at 2:29. Using a "nicotine as a suitable salt" also addresses volatility concerns and "eliminate[s] the need for a combination." *Id.* at 4:43-44. Thus, the specification distinguishes nicotine combinations, including complexes, as lacking the claimed benefits of the disclosed invention.

*Second*, in "Example 10," to "compare the nicotine release [rate] from products according to the disclosed invention" with the release rate of other products, the specification describes testing a "reference product [that] is based on a nicotine polacrilex *complex* (Amberlite IRP 64 )." '908 Patent at 13:43:44 (emphasis added). The specification states that, "[t]his complex is commercially available and is used in nicotine products for smoking reduction and cessation." *Id.* at 13:45-47. For the comparison, "[b]oth batches [of the "nicotine polacrilex complex"] were manufactured in house in a similar way as described in Examples 2-6 *with the important exception that a nicotine complex, and not a nicotine salt*, was used." *Id.* at 13:49-53 (emphasis added). Thus, the specification distinguishes a nicotine complex from the claimed "nicotine salt," and more specifically, affirmatively excludes nicotine polacrilex complex because it is "not a nicotine salt." This is illustrated further by the specification's distinction between nicotine polacrilex complex on the one hand and "products according to the disclosed invention" on the other. *See id.* at 15:53-57 ("For all experimental conditions, the nicotine release for the products according to the disclosed invention is more rapid than for reference products, both the reference product based upon the nicotine-cellulose combination and the reference product based upon the nicotine polacrilex complex.").

Pinkerton argues that—contrary to the language in the specification—nicotine polacrilex is not a "combination," and therefore cannot be excluded by the specification's distinction of formulae "where the nicotine base has formed *a combination* with other components," *including* those that have been "bound to, adsorbed to, absorbed into, enclosed into or *forming a complex* or any other non-covalent bounding with other components." '908 Patent at 1:57-64 (emphasis added). But Pinkerton acknowledges that "combination" "is not a term of art in the field, but rather, a term described by the '908 patent," i.e., "[t]he specification at column 1, lines 55-64, describes the meaning of this term in the '908 patent." POB at 18. Thus, the specification's teaching, that combinations, including complexes, are unsuitable for the claimed invention, controls. *See Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."). Accordingly, the Court finds unpersuasive Pinkerton's arguments concerning the type of chemical bonding present in various compounds.[3]

Pinkerton also argues that Example 10 compares "reference products" with unsuitable nicotine release rates, as opposed to demonstrating that the claimed invention excludes what the specification refers to as combinations generally, including nicotine polacrilex complex specifically. But the specification makes clear that the distinguishing characteristics in Example 10 relate to the nicotine *source*, not the nicotine *release rate* of a particular product. *See* '908 Patent at 13:22-25 ("The nicotine source is however not a nicotine salt as in the disclosed invention, but nicotine combinations.").

Finally, Pinkerton's claim differentiation argument likewise fails because the fact that dependent Claim 3 limits the type of suitable nicotine salts to those listed therein does not suggest that "nicotine salt" in Claim 1 must therefore include complexes. Even assuming Pinkerton provided an equally plausible interpretation of "nicotine salt" to include some complexes, its claim construction would still fail given the specification's clear exclusion of "nicotine polacrilex complex." Even "[w]here there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning, [the Federal Circuit] consider[s] the notice function of the claim to be best served by adopting the narrower meaning." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996). Pinkerton fails to explain how the notice function would be served by construing "nicotine salt" to include "nicotine polacrilex complex," especially

---

[3] Pinkerton seizes upon the specification language that distinguishes prior art, including nicotine base that has formed a combination through the process of "non-covalent bounding [*sic*]." In doing so, Pinkerton reads too much into the referenced process and too little into its context—which was to nonexhaustively illustrate distinguishable prior art that used "[a] number of different formulations where the nicotine base has formed a combination with other components." The next sentence, containing the reference to non-covalent bonding, makes clear that the illustration was nonexhaustive by using the words, "for example." Pinkerton's narrow reading, moreover, cannot be squared with other parts of the specification that have previously been discussed (e.g., Example 10).

where the specification states expressly that it is *not* a nicotine salt within the meaning of the patent.

The Court need not reach the parties' arguments about whether clear and unmistakable disavowal has been shown because the Federal Circuit "does not require explicit redefinition or disavowal" when the description itself is affirmatively limiting. *Trs. of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). As explained above, the specification is affirmatively limiting by distinguishing "nicotine salt" from combinations, including complexes, and by specifically excluding nicotine polacrilex complex as something that is not a claimed "nicotine salt" within the scope of the disclosed invention. *See also, e.g.*, *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("when the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope"); *Cave Consulting Grp., LLC v. OptumInsight, Inc.*, 725 F. App'x 988, 995 (Fed. Cir. 2018) ("a finding of a disclaimer is not correct when, as here, the description of the invention itself is affirmatively limiting").

Moreover, where the intrinsic evidence provides the scope of the invention, the Court need not reach the voluminous competing extrinsic evidence submitted by the parties, including the competing expert witness testimony. *See Vitronics*, 90 F.3d at 1583 ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence."); *Phillips*, 415 F.3d at 1318 ("extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence;" thus, "a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history") (quotation marks omitted).

For the reasons stated above, the Court concludes that the plain and ordinary meaning of "free nicotine salt," when viewed in the context of the entire '908 Patent is, "a nicotine compound formed from the ionic bonding of a nicotine base cation with an acidic anion, which does not include nicotine complexes and does not form any combination with any other component in the product while in storage."

2. "A product for oral delivery of nicotine" (Claim 1)

| Pinkerton's / Swedish Match's Proposed Construction | Kretek's Proposed Construction |
|---|---|
| Limiting: "A product for oral delivery of nicotine, except for the reference products of Example 10." | Not limiting: no construction required |
| **Modoral's Proposed Construction** | **Court's Construction** |
| Same as Kretek. | Not limiting: no construction required |

The parties dispute whether the preamble is limiting. The Court concludes it is not and no construction is required.

Pinkerton argues that the preamble provides a structural limitation, i.e., the term "a product" provides the antecedent basis for the term "said product" in the body of the claim, and therefore it should be construed as limiting. POB at 26-27. Additionally, Pinkerton argues that "oral" in the preamble provides context for "saliva" in the claim, thereby distinguishing from other types of nicotine delivery (*e.g.*, transdermal). *Id.* at 27. Building upon its earlier arguments concerning the "reference products" of Example 10, Pinkerton also argues that the preamble should be construed as limiting such that it reflects exclusion of those reference products. *Id.* Pinkerton contends there was no need to distinguish in the preamble the claimed invention from the prior art, because the only prior art considered by the Examiner related to other nicotine oral-delivery products. PRB at 21.

Kretek argues that, "[b]ecause the preamble here introduces the field of the invention and the body of the claim defines a complete invention, the preamble is not a limitation to claim 1." KOB at 17. Kretek finds support for its argument in the specification, which states that "'[t]he invention relates to a product for oral delivery of nicotine' and then defines the claimed invention by identifying the specific ingredients in the compositions." *Id.* at 18 (quoting '908 Patent at Abstract. Kretek observes that the preamble does not distinguish prior art, but rather uses a "shorthand label or descriptive name" for the invention. *Id.* at 19. Where Claim 1 discloses "said product upon contact with purified water gives a pH of at least 6," Kretek argues that "a POSA would understand this later reference to 'product' refers to and further limits the already defined ingredients in the body of the claim." *Id.* at 19-20. Moreover, Kretek argues that a POSA would understand saliva is found in the mouth only, and would not need "oral delivery" recited to know this. KRB at 13. Even if the preamble is limiting, Kretek argues there is no

support for Pinkerton's proposed exclusion concerning the reference products of Example 10. *Id.*

In support of Kretek's position, Modoral generally repeats Kretek's arguments. *See* MSB at 11-12. Swedish Match rests on the arguments made in Pinkerton's Opening Brief. SSB at 4 n.1.

"[A]s a general rule[,] preamble language is not treated as limiting." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). To determine "whether a preamble limits a claim," the Court analyzes the preamble to see "whether it states a necessary and defining aspect of the invention or is simply an introduction to the general field of the claim." *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006); *see also Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (whether a preamble is limiting requires "review of the entire [] patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim").

The Court finds that the relevant preamble in the '908 Patent, "A product for oral delivery of nicotine," is not limiting because it does not provide a necessary or defining aspect of the invention. The claim limitations of Claim 1 disclose the complete invention, and the preamble does nothing more than introduce the general field of the invention. When viewed in light of the entire patent, the inventors claim the composition of the product and method for delivery, but the preamble language adds nothing structural. The Court agrees that the limitation "permeable for saliva" would alert a POSA to the fact that the invention involves oral delivery.

The Court is unconvinced that the preamble provides antecedent basis for "said product." The relevant portion of Claim 1 discloses: "wherein said product upon contact with purified water gives a pH of at least 6 and wherein said powder being substantially free from adsorbed and/or absorbed nicotine." '908 Patent at 18:8-11. The fact that this limitation includes "said powder," but the preamble does not introduce "the powder," suggests that the limitation's reference to "said product" is simply referring to what is claimed (i.e., a nicotine salt, pH adjusting agent, filler, and water insoluble pouch make up the "said product" and the items mixed together in the pouch make up the "said powder").

Additionally, even if the Court agreed that the preamble was limiting, the Court finds unpersuasive Pinkerton's argument that it should be construed to

include, "except for the reference products of Example 10." The Court finds no support for this construction, either in the patent or in precedent analyzing preamble construction. It appears instead to be a judicial invitation to rewrite the patent by excising parts of the specification that undermine Pinkerton's expansive reading of it. The invitation serves only to highlight the difficulty of that reading.

3. "Wherein said powder being substantially free from adsorbed and/or absorbed nicotine" (Claim 1)

| **Pinkerton's / Swedish Match's Proposed Construction** | **Kretek's Proposed Construction** |
|---|---|
| "wherein said powder is largely but not necessarily wholly free of nicotine that is sorbed on or in another component in the powder" | "wherein the powder contains no more than a trace amount of nicotine where the nicotine has formed a combination" |
| **Modoral's Proposed Construction** | **Court's Construction** |
| "wherein said powder contains no more than trace amounts of adsorbed and/or absorbed nicotine" | "wherein said powder contains no more than an insignificant amount of adsorbed and/or absorbed nicotine" |

The parties agree that this term was added during prosecution to overcome the Examiner's prior art rejection. The parties disagree on the impact of this amendment (i.e., did it limit the type of nicotine, thereby excluding combinations (Kretek), or limit the type of interaction the nicotine has with another component, thereby limiting it to sorbed nicotine (Pinkerton)). The parties also disagree about the meaning of "substantially."

Pinkerton argues that plain and ordinary meaning applies because a POSA would understand that "substantially" is a term of approximation that means "largely but not necessarily wholly." POB at 28-29. Further, adsorb means "physical assimilation of a substance at the surface of a solid or liquid," and absorb means "the physical assimilation of a substance within the bulk of a solid or liquid." *Id.* at 29. Thus, Pinkerton suggests that the construction should include the overarching term "sorb," which means "to take up and hold either by adsorption or absorption." *Id.* Further, Pinkerton argues this definition comports with the prosecution history, during which the applicant overcame a rejection due to prior art reference "Brinkley," which "specifically describes a nicotine-containing pouch that contains 6 mg of absorbed nicotine," but did not disclose "a product that

contains a powder having nicotine, wherein said powder is substantially free from adsorbed and/or absorbed nicotine." *Id.* at 29 (citing Ridge Decl., Ex. 7 at ¶¶ 39, 76, ECF No. 218-8; Ex. 24 at 5, ECF No. 218-25. Further, as before, Pinkerton argues that the record does not support Kretek's suggestion that this term excludes all combinations. *See id.* at 29-30. Pinkerton notes that the claim language, "at least one free nicotine salt," does not limit the disclosed invention to *only* free nicotine salts or nicotine salts, as opposed to also including other forms of nicotine. PRB at 22. Further, construing the Examiner's comments to limit the amendment to "unbound" nicotine is inconsistent with the specification, which lists bound nicotine as one type of nicotine combination, and ignores the purpose of looking at the prosecution history, which is to discern the applicant's intent. *Id.* at 23 n.6, 24.

Kretek argues that this term must be construed in light of the prosecution history, wherein the applicant added this limitation to overcome the teachings of Brinkley, which disclosed a pouch product with two nicotine sources. KOB at 22-23. After adding the proposed amendment, the applicant distinguished Brinkley by arguing that, "'Brinkley specifically describes a nicotine-containing pouch that contains 6 mg of absorbed nicotine and 1 mg of nicotine levulinate,' [but] it does not teach a product that contains a powder that 'is substantially free from adsorbed and/or absorbed nicotine.'" *Id.* at 23 (quoting Bloch Decl., Ex. E, Prosecution History at 189, ECF No. 215-6 (Bates Nos. SM-1192_00000344, 347-349).[4] Kretek explains that its proposed construction also tracks the specification, "which explicitly distinguishes between nicotine salts of the invention from other forms of nicotine combinations, where nicotine is 'bound to, adsorbed to, absorbed into, enclosed into or forming a complex or any other non-covalent bounding with other components.'" *Id.* at 24 (quoting '908 Patent, 1:57-64). Kretek rejects Pinkerton's experts' dictionary-based definitions because they do not address the relevant prosecution history. *Id.* at 24-25. Kretek also argues that Pinkerton's proposal renders "free" in "free nicotine salt" superfluous. *Id.* at 25.

In its supplemental brief, Modoral argues that its "proposed construction is supported by the intrinsic evidence, including the description of the invention in the '908 [P]atent and its prosecution history." MSB at 13. Modoral explains that adsorbed and absorbed nicotine have well-established plain and ordinary meanings and thus require no further construction. *Id.* Relying on the prosecution history, Modoral explains that, during an interview with the Examiner, the applicant

---

[4] All future filings must comply with L.R. 11-3.3, L.R. 11-5.2, and L.R. 11-5.3, requiring consecutive pagination and the exhibit number above or below the page number on each page of the exhibit.

proposed limiting the nicotine compound to “unbound nicotine salt.” *Id.* at 13-14 (citing McAuley Decl. Ex. M at 2, ECF No. 127-13). Further, Modoral argues that if Pinkerton’s proposed construction is adopted, the limitation becomes indefinite because it provides no information from which a POSA could objectively define “largely but not necessarily wholly free.” *Id.* at 15.

In its supplemental brief response, Swedish Match rests on the arguments made in Pinkerton’s Opening Brief. SSB at 4 n.1.

The Court agrees that “adsorbed and/or absorbed nicotine” is well understood and should be given its plain and ordinary meaning. Thus, the Court must resolve what “substantially free” means in the context of the claim limitation added to overcome the Examiner’s rejection. The new limitation amended Claim 1 by adding, “and wherein said powder being substantially free from adsorbed and/or absorbed nicotine.” Although Pinkerton is correct that “at least one free nicotine salt” does not limit the claim to only *free* nicotine salts or only *salts*, the added limitation separately cabins what type of nicotine can be present. That is, the powder as a whole must be “substantially free” from any sorbed nicotine. Although the prosecution history shows that this limitation was added to overcome a rejection, nothing about the language of the amendment or the patent as a whole suggests that the limitation should carry anything other than plain and ordinary meaning.

The meaning of “substantially” comes up frequently in patent cases. When the Federal Circuit “[was] asked, once again, to construe the meaning of the term ‘substantially’ in a patent claim,” it noted that its “cases recognize the dual ordinary meaning of this term as connoting a term of approximation *or* a term of magnitude.” *Deering Precision Instruments, L.L.C. v. Vector Distribution Systems, Inc.*, 347 F.3d 1314, 1322-23 (Fed. Cir. 2003) (emphasis added) (collecting cases where the court construed “substantially”). Given this dual meaning, the court “turn[ed] to the intrinsic evidence to determine which interpretation should be adopted.” *Id.* at 1323 (relying on specification to determine that “substantially” was a term of magnitude).

When read in context of Claim 1 and the ’908 Patent as a whole, “substantially” describes a term of magnitude describing *how* “free” of adsorbed or absorbed nicotine the powder must be. To comport with the invention’s requirements—to “give a rapid and almost complete delivery of nicotine, be free from other harmful components, deal with the stability and volatility problems of

nicotine base and finally be cheap and simple to manufacture"—the Court concludes that plain and ordinary meaning for "substantially free" in this context means "no more than an insignificant amount." *See* '908 Patent at 2:56-59. Stated another way, the powder can contain no more than an insignificant amount of absorbed and/or adsorbed nicotine. This plain and ordinary meaning construction comports with the specification and is consistent with the prosecution history underlying the amendment, reflecting the applicant's intent to overcome the Examiner's rejection based on Brinkley.

Accordingly, for the foregoing reasons, the Court applies plain and ordinary meaning to this limitation, wherein a POSA would understand "substantially free" to mean "no more than an insignificant amount."

III.

For the reasons stated, the Court construes the undisputed and disputed claim terms as follows:

| Term | Court's Construction |
|---|---|
| "granulated" (Claim 21) | "formed into grains or agglomerates" |
| "free nicotine salt" (Claim 1) | "a nicotine compound formed from the ionic bonding of a nicotine base cation with an acidic anion, which does not include nicotine complexes and does not form any combination with any other component in the product while in storage" |
| "a product for oral delivery of nicotine" (Claim 1) | Not limiting: no construction required |
| "wherein said powder being substantially free from adsorbed and/or absorbed nicotine" (Claim 1) | "wherein said powder contains no more than an insignificant amount of adsorbed and/or absorbed nicotine" |

**IT IS SO ORDERED**.

0/23